# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting *En Banc*

**UNITED STATES, Appellee**
**v.**
**Private E2 BRIAN A. MURPHY**
**United States Army, Appellant**

ARMY 20120556

Headquarters, 82d Airborne Division
G. Bret Batdorff, Military Judge
Lieutenant Colonel Paul J. Cucuzzella, Staff Judge Advocate

For Appellant: Captain A. Jason Nef, JA; Captain Brian J. Sullivan, JA (on brief).

For Appellee: Major Robert A. Rodrigues, JA (on brief).

30 May 2014

----------------------------------
OPINION OF THE COURT
----------------------------------

HAIGHT, Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of two specifications of conspiracy to sell military property, the wrongful use of oxycodone, and two specifications of larceny, in violation of Articles 81, 112a and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 912a, and 921 [hereinafter UCMJ]. The military judge sentenced appellant to a bad-conduct discharge, confinement for forty-eight months, and reduction to the grade of E-1. Pursuant to a pretrial agreement coupled with a thirty-day reduction in confinement for dilatory post-trial processing, the convening authority approved only so much of the sentence as provides for a bad-conduct discharge, confinement for seventeen months, and reduction to E-1.[1]

---

[1] The military judge awarded thirty days of confinement credit. Although this credit should have been reflected in the Action and Promulgating Order, it was not. *See* Rule for Courts-Martial 1107. Accordingly, to the extent appellant has not already received this credit, appellant will be credited with thirty days against his sentence to confinement.

This case is before us for review pursuant to Article 66, UCMJ. Appellant personally raised two issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), both of which merit discussion, one of which merits relief.

**FACTS**

Appellant required additional money to support his illegal drug habit. Therefore, in August of 2011, appellant entered into an agreement with his co-conspirator, Specialist (SPC) WW, to steal and then sell military ammunition. This particular enterprise did not come to fruition until 6 September 2011. As it turns out, appellant effectuated this conspiracy twice on the same day.

At the conclusion of a military range exercise, appellant was assigned as a member of a detail tasked to return unspent ammunition to the Ammunition Supply Point. Due to inclement weather shut-downs, the detail was unable to turn in the unused ordnance on that day and instead left the ammunition in the back of a military truck in the company area. Appellant was then released for the day. Recognizing the opportunity, appellant called SPC WW and they agreed that this was their chance to carry out their conspiracy. Appellant returned to the company area; stole two boxes of loose 5.56 millimeter (mm) ammunition, each comprising 900 rounds for a total of 1800 rounds; and transported them to SPC WW's house. A buyer whom SPC WW had contacted arrived and purchased the stolen ammunition.

Appellant and SPC WW immediately took their proceeds to a gas station, purchased cigarettes, and SPC WW took appellant to a drug supplier from whom appellant purchased five Percocet pills. During this time frame, appellant and SPC WW agreed they would steal and sell some more of the ammunition that appellant had left behind in the military truck. Later that same night, appellant returned to the company area and stole two crates of linked 5.56 mm ammunition, each comprising 1600 rounds for a total of 3200 rounds. He transported this stolen ammunition to SPC WW's house, where the two carried the crates to the backyard shed as it was too late in the day to sell the contraband at that time. The next day, the ammunition was discovered to be missing and an investigation ensued, in which appellant was eventually implicated.

Appellant pleaded guilty to and was convicted of two specifications of conspiracy to sell "5.56 mm ammunition, explosives, military property of the United States" and two specifications of stealing that ammunition, again described as "explosives." The difference in the two conspiracy convictions is that the overt acts alleged to accomplish the first conspiracy concern the theft and sale of the 1800 rounds of loose 5.56 mm ammunition whereas the overt acts for the subsequent conspiracy concern the theft and transport of the 3200 rounds of linked 5.56 mm ammunition.

Appellant now argues that 5.56 mm ammunition is not an explosive. He also now asserts that his meeting of the minds with SPC WW constitutes but one conspiracy, not two.

## LAW AND DISCUSSION

*Definition of Explosive*

For purposes of Article 103, UCMJ, the failure to secure or wrongful disposition of captured or abandoned property; Article 108, UCMJ, the wrongful sale, loss, damage, destruction, or disposition of military property; and Article 121, UCMJ, the larceny of personal property, the maximum allowable punishment is significantly increased if the property in question is a firearm or explosive. *See Manual for Courts-Martial*, *United States* (2008 ed.) [hereinafter *MCM*], pt. IV, ¶¶ 27.e, 32.e, 46.e.[2][3] Rule for Courts-Martial [hereinafter R.C.M.] 103(11) defines the term "explosive" as follows:

> "Explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electrical circuit breakers), detonators, and other detonating agents, smokeless powders, any explosive bomb, grenade, missile, or similar device, and any incendiary bomb or grenade, fire bomb, or similar device, and any other compound, mixture, or device which is an explosive within the meaning of 18 U.S.C. § 232(5) or 844(j).

---

[2] Appellant's misconduct occurred in 2011. Therefore, the 2008 edition of the *MCM* is applicable to his offenses. The relevant provisions of the 2008 *MCM* remain unchanged in the 2012 edition of the *MCM*.

[3] The maximum sentence for either selling military property or stealing military property of a value of $500.00 or less pursuant to Articles 108 and 121, UCMJ, respectively, is a bad-conduct discharge, one year of confinement, and forfeiture of all pay and allowances. However, if the military property sold or stolen is "any firearm or explosive," regardless of value, the maximum sentence for each of these offenses is a dishonorable discharge, ten years of confinement, and forfeiture of all pay and allowances. For Article 103, UCMJ, if the captured or abandoned property is "any firearm or explosive," the maximum sentence is a dishonorable discharge, five years of confinement, and total forfeitures, as opposed to a maximum punishment of a bad-conduct discharge, six months of confinement and total forfeitures if the property in question is of a value of $500.00 or less.

Therefore, in accordance with a "plain meaning" interpretation of the above definition, ammunition which contains gunpowder or smokeless powder is unambiguously an explosive as those terms are expressly listed in the definition, with gunpowder as the very first example. *See United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2013) ("Unless the text of a statute or rule is ambiguous, 'the plain language will control unless it leads to an absurd result.'"); *see also State v. Field*, 132 N.H. 760, 766, 571 A.2d 1276, 1280 (1990) ("defendant's argument that a round of live ammunition is not an explosive strains credulity"). However, appellant's reliance on *United States v. Lewis*, ARMY 20120797, 2013 WL 1960747 (Army Ct. Crim. App. 27 Feb 2013) (summ. disp.), compels further analysis.

In *Lewis*, a panel of this court determined "5.56 mm rounds of ammunition are not explosives for the purposes of Articles 108 and 121, UCMJ." *Lewis*, 2013 WL 1960747, at *1. In its decision, that panel relied upon *United States v. Graham*, 691 F.3d 153 (2d Cir. 2012) *vacated on other grounds*, __ U.S. __, 133 S.Ct. 2851 (2013). In *Graham*, the United States Court of Appeals for the Second Circuit concluded a single 9 mm cartridge did not fall within 18 U.S.C. § 844(j)'s definition of an "explosive." *Graham*, 691 F.3d at 161. As the definition of explosive in § 844(j) substantially mirrors that in R.C.M. 103(11), this conclusion appears persuasive. However, upon further review, general application of *Graham* to Articles 103, 108 and 121, and that ruling's specific application to the facts of this case are inapposite.

Regarding the general applicability of the reasoning in *Graham* to Articles 103, 108 and 121, we note the Second Circuit was grappling with a fundamentally different question than we are. That court was defining the interplay between two separate federal crimes, one being that of the use or carry of a "firearm" during and in relation to a crime of violence and the second being the use or carry of an "explosive" during the commission of any felony. *Graham*, 691 F.3d at 155. *See* 18 U.S.C. §§ 924(c) and 844(h). While perpetrating the crime of extortion, Graham fired a single shot from his 9 mm pistol into the ground next to his victim. *Graham*, 691 F.3d at 157. Because that single round of ammunition was considered an explosive at trial, "Graham's 50-year sentence included two consecutive, mandatory 10-year terms of imprisonment for the violations of 18 U.S.C. § 924(c)(1)(A)(iii) [discharge of a firearm] and 18 U.S.C. § 844(h)(1) [use of an explosive]." *Id*. at 155. Essentially, on appeal, the *Graham* court determined an interpretation of the term "explosive" which required the "explosive" sentencing enhancement to be stacked atop the "firearm" sentencing enhancement was unreasonable and accordingly concluded that a single 9 mm round was not an "explosive" for purposes of § 844(h)(1). *Id*. at 164.

Turning to military law, for purposes of Articles 103, 108, and 121, a sentence aggravator applies if the property which is the object of those crimes is an explosive. A sentence modifier in property crimes which deals with the nature of

4

the property in question is far different than a sentence modifier which deals with the means of a violent crime and what particular tools are implemented to effectuate that crime.[4] The distinction between a sentence aggravator based upon how a crime is committed and one based upon the nature of the property that is the object of a particular crime is repeatedly stressed in the *MCM*'s Analysis of the Punitive Articles.[5]

---

[4] We recognize that the Article 134, crime of "threat or hoax designed or intended to cause panic or public fear" refers to harms threatened to be done by means of an explosive, among other means. While we need not determine if explosives include small arms ammunition for purposes of that offense, we do note that particular paragraph is the *MCM*'s only use of the term "explosive" not in conjunction with the term "firearm." Therefore, on those occasions where the two are mentioned together, words and terms should be interpreted in accordance with their companions. *See Gutierrez v. Ada*, 528 U.S. 250, 255 (2000) (Supreme Court invokes the canon *noscitur a sociis*).

[5] The 2002 Amendment to the authorized maximum punishment for Article 103 adds the sentence aggravator "any firearm or explosive" because "regardless of the intrinsic value of such items, the threat to the community is substantial when such items are wrongfully bought, sold, traded, dealt in or disposed." *MCM*, App. 23, Analysis of Punitive Articles, ¶ 27.e at A23–8. This same sentence aggravator applies to Article 108, because:

> [t]he harm to the military in such cases is not simply the intrinsic value of the item. Because of their nature, special accountability and protective measure are employed to protect firearms or explosives against loss, damage, destruction, sale, and wrongful disposition. Such property may be a target of theft or other offenses without regard to its value. Therefore, to protect the Government's special interest in such property, and the community against improper disposition, such property is treated the same as property of a higher value.

*MCM*, App. 23, Analysis of Punitive Articles, ¶ 32.e at A23–9. Likewise, this same sentence aggravator applies to Article 121 for similar reasons "because, regardless of the intrinsic value of such items, the threat to the community and disruption of military activities is substantial when such items are wrongfully taken." *MCM*, App. 23, Analysis of Punitive Articles, ¶ 46.e at A23–16.

Distinct from the scenario in *Graham*, in every instance that the President allows for an "explosive" to be a sentence aggravator for crimes under the UCMJ, it is coupled with the term "firearm."[6]  Accordingly, the *MCM*'s use of the phrase "firearm or explosive" as a single aggravator alleviates any fear of dual enhancements.  Also distinguishing the "explosive" sentence enhancer applicable in *Graham* from that in Articles 103, 108 and 121, UCMJ, is that the one in 18 U.S.C. § 844(h) is mandatory as opposed to the mere potentiality of an increased sentence under the UCMJ.

We agree with the *Graham* court that textual interpretation "'is a holistic endeavor'" and must be conducted "'in light of the surrounding language and framework'" as well as by looking to the overall statutory or regulatory scheme. *Graham*, 691 F.3d at 160 (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008)).  We hasten to point out the legal framework under the UCMJ, Title 10, is significantly different from that of the framework under Title 18, United States Code.  In fact, the *MCM*'s Analysis to R.C.M. 103 (Definitions) emphasizes, "[i]t is the drafters' intent that the words of the Manual be construed in accordance with their plain meaning, with due deference to previous usage of terms in military law or custom."  R.C.M. 103 analysis at A21-4.  Likewise, in our interpretation of "explosives" for purposes of military law, we are not restricted to the Second Circuit's interpretation of that same term for the purpose of its application to a completely different statute and different form of sentence aggravator.  In other words, applying *Graham* to Articles 103, 108 and 121, UCMJ, is an exercise in the age-old comparison of apples to oranges.  Again, reference to the *MCM*'s analysis of the R.C.M. provides pointed guidance:

> A rule is binding even if the source of the requirement is a judicial decision or a statute not directly applicable to courts-martial.  If the President had adopted a rule based on a judicial decision or a statute, subsequent repeal of the statute or reversal of the judicial decision does not repeal the rule. . . .
>
> . . . Users are reminded, however, that primary reliance should be placed on the plain words of the rules. . . .

---

[6] The dissent in *United States v. Davis*, 202 F.3d 212, 221-22 (4th Cir. 2000), stresses that offenses involving the use of explosives and offenses involving the use of firearms are often treated separately.  (Michael, J. dissenting).  This is simply not the case for purposes of Articles 103, 108 and 121, where "firearm or explosive" is treated as a single modifier.

> . . . Developments in the civilian sector that affect the underlying rationale for a rule do not affect the validity of the rule except to the extent otherwise required as a matter of statutory or constitutional law. . . . Once incorporated into the Executive Order, such matters have an independent source of authority and are not dependent upon continued support from the judiciary.

R.C.M. (Introduction) analysis at A21-3. In this opinion, we apply the definition provided by the President. We do not add, expand, or broaden that definition, nor do we restrict, limit, or reject portions of it as the dissent would have us do. If the President had wanted the "explosive" sentence enhancer to only apply to amounts of gunpowder or smokeless powder greater than that found in small arms ammunition, then the process to effect such a desire was certainly known. For example, the maximum punishment for longer unauthorized absences is greater than that for those of shorter duration. Likewise, the potential sentence for possession of less than 30 grams of marijuana is less severe than that for possession of a greater quantity of the same drug. *See MCM*, pt. IV, ¶¶ 10.e, 37.e.

The imprudence of applying *Graham* to Article 103, 108 or 121, UCMJ, is alluded to in that decision itself. First, when addressing the Fourth Circuit's conclusion in *Davis*, 202 F.3d 212, that the firing of handgun ammunition into a dwelling constituted property damage by use of an "explosive," the court in *Graham* specifically pointed out the *Davis* court was not "grappl[ing] with the relationship between the respective sentencing enhancements in § 844(h) (explosives) and § 924(c) (firearms)." *Graham*, 691 F.3d at 163. Neither are we.

Second, it is difficult to reconcile any determination that the 18 U.S.C. § 844(j) definition of "explosive" does not include small arms ammunition with § 844(g)'s apparent criminalization of the possession of an explosive in the form of small arms ammunition in an airport. Under § 844(g), it is a crime to possess an explosive in an airport, but the statute provides a specific exception to criminal liability if the possession of the explosive in question is ammunition inside either checked baggage or a closed container. Therefore, ammunition possessed outside of checked baggage *is included* within the definition of "explosive." The *Graham* court resolved this apparent contradiction to their interpretation by stating, "[s]uffice it to say that the Government arguments [that the structure of 844(g) supports including small arms ammunition within the definition of explosive] are aimed at a different case than the one before us today." 691 F.3d at 164. We are now faced with such "a different case."

Regarding the specific applicability of *Graham* to the instant case, when declining to view a single 9 mm cartridge as an explosive, that court refrained from speculating how 18 U.S.C. § 844(j)'s definition of "explosive" applied to

ammunition generally. *Id*. at 162. The Second Circuit stated, "[w]e do not hold here that ammunition generally (small arms or otherwise), which may conceivably be employed in quantities or in a manner far different from the single 9-millimeter cartridge discharged by Graham, cannot fall within 844(j)'s definition of explosive, and thus trigger the 844(h) enhancement. We decide only the case before us." *Id*. 164. We do the same here.

With respect to how R.C.M. 103(11) defines "explosives," we believe it is a simple question of reverse logic. Surely, the lethal rifles and pistols which our servicemembers are issued, trained on, deploy with, defend themselves with, engage the enemy with, have access to, and are in regular contact with are firearms. "Firearm" is defined as "any weapon which is designed to or may be readily converted to expel any projectile by the action of an *explosive*." R.C.M. 103(12) (emphasis added).[7] Therefore, if a servicemember's individual weapon is only a firearm if it discharges by virtue of an explosive, then the ammunition which provides that required explosive must, by logic, be included within that term's definition.[8] More simply put, if 5.56 mm ammunition is not an explosive, then, by definition, the weapon that fires it cannot be a firearm. Such a conclusion is untenable and obviously not contemplated by the President when adding a sentence escalator for firearms and explosives to the maximum allowable punishments for Articles 103, 108, and 121, in order to protect the community and prevent disruption to the military mission. Loss of accountability for rounds of ammunition, regardless of their value, is more dangerous and disruptive than the loss of $1,000.00 worth of canteen covers.[9]

---

[7] *Cf. United States v. Laster*, 42 M.J. 538, 542 (A.F. Ct. Crim. App. 1995) (pellet pistol which expels projectile via carbon dioxide is not a firearm); *United States v. Hawthorne*, ARMY 9800209, 2001 WL 36264251, at *4 (Army Ct. Crim. App. 26 Jan. 2001) (mem. op.) (BB or pellet guns that use air or carbon dioxide pressure to expel a projectile are not firearms).

[8] This simple and persuasive syllogism matches the holding in *Davis*, 202 F.3d 212 (determining that use of handgun ammunition is, by definition under § 844(j), use of an explosive).

[9] Although quantity is not dispositive of our definitional analysis, we note appellant conspired to sell, and then stole two boxes and two crates of 5.56 mm ammunition, totaling 5000 rounds, each cartridge containing its corresponding amount of gunpowder or smokeless powder. Needless to say, the "explosive" nature of such an amount, in the aggregate, is evident.

After entering his plea of guilty and having the term "explosive" defined for him multiple times—in accordance with R.C.M. 103(11)—by the military judge, appellant admitted under oath that the ammunition which he conspired to wrongfully sell and stole constituted explosives no less than twelve times. These admissions are significant as they occurred after the military judge highlighted to appellant and counsel that he needed to be convinced that the property was of the explosive nature alleged. Appellant took this to heart and asserted, "I dealt with ammunition the whole time I was at Fox Company and I was very aware that it was an explosive."[10] We concur with appellant's assessment at trial. While 5.56 mm ammunition may not qualify as "high explosives," it is an "explosive." *See United States v. Bopp*, NMCM 200200334, 2002 WL 31720713, at *4 (N.M. Ct. Crim. App. 25 Nov. 2002) (firecrackers constitute an "explosive" but do not constitute a "highly explosive article"); *United States v. Hall*, 3 M.J. 969 (N.C.M.R. 1977) *rev'd on other grounds*, 5 M.J. 134 (C.M.A. 1978). (while blank rounds of M-16 ammunition contain gunpowder, which is a propellant explosive, they are not high explosives). We, therefore, conclude no error was committed in accepting appellant's guilty pleas to his crimes which equated the 5.56 mm ammunition in question to explosives.

*Conspiracy*

Appellant was charged with conspiring with SPC WW to sell loose 5.56 mm ammunition and separately charged with conspiring at the same time and location with the same co-conspirator to sell linked 5.56 ammunition. This charging scheme may have originally made sense if the government theory was that the objectives of those two conspiracies were different in that separate agreements were entered into with the specific purpose of selling distinct properties of two different natures. If so, then the first conspiracy terminated when the loose 5.56 mm ammunition was sold. *See United States v. Beverly*, 14 U.S.C.M.A. 468, 471, 34 C.M.R. 248, 251

---

[10] Complementing his certainty that 5.56 mm ammunition met the definition of "explosives" under R.C.M. 103(11), appellant also assured the military judge that his understanding comported with that of the United States military by acknowledging that a joint service regulation specifically labels small arms ammunition as "explosive ordnance." *See* Army Reg. 75-14/Chief of Naval Operations Instr. 8027.1G/Marine Corps Order 8027.1D/Dep't of Air Force Reg. 136-8, Interservice Responsibilities for Explosive Ordnance Disposal, para. 3.e (14 February 1992). This regulatory reference and its admission into evidence further reveals that appellant, a soldier, had "fair warning" and "notice" that the object of his crimes, 5.56 mm ammunition, constituted explosives. *See United States v. Desposito*, 704 F.3d 221, 229-30 (2d Cir. 2013); *see also United States v. Warner*, 73 M.J. 1 (C.A.A.F. 2013).

(1964) (a conspiracy is terminated when the object of that conspiracy is accomplished).

However, the above is not how the facts unfolded. Instead, appellant pleaded guilty to two specifications of conspiracy to commit the same crime, the sale of 5.56 mm ammunition, explosives, military property of the United States. In accordance with his pleas, he was found guilty twice of the same conspiracy, albeit with different supporting overt acts. This is the very issue[11] that our superior court summarily disposed of in *United States v. Jones*, 72 M.J. 97 (C.A.A.F. 2013) (summ. disp). It is clear from the record—specifically the stipulation of fact—that the agreement between appellant and his co-conspirator was to sell ammunition generally, regardless as to whether it was loose or linked, as part of a single ongoing "illicit business arrangement." *See also United States v. Pereira*, 53 M.J. 183 (C.A.A.F. 2000). Therefore, as the Court of Appeals for the Armed Forces (CAAF) did in *Jones*, we will consolidate the two conspiracy specifications. *Jones*, 72 M.J. 97. Also, like the CAAF in *Jones*, although we merge the two conspiracy offenses, we are satisfied that appellant suffered no prejudice as to his sentence. *See United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013); *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

**CONCLUSION**

Specifications 1 and 2 of Charge I are consolidated into a single specification, The Specification of Charge I, to read as follows:

> Charge I: Article 81.
>
> THE SPECIFICATION: In that Private (E-2) Brian A. Murphy, U.S. Army, did, at or near Fort Bragg, North Carolina, between on or about 1 August 2011 and on or about 6 September 2011, conspire with Specialist W.C.W. to commit an offense under the Uniform Code of Military Justice, to wit: selling 5.56 mm ammunition, explosives, military property of the United States, and in order to effect the object of the conspiracy the said Private (E-2) Brian A. Murphy removed loose 5.56 mm ammunition, brought it to Specialist W.C.W., Specialist W.C.W.

---

[11] The court granted the petition for grant of review of the following issue: "WHETHER A SINGLE AGREEMENT TO COMMIT THE SAME CRIME ON MULTIPLE OCCASIONS IS LEGALLY SUFFICIENT TO SUPPORT FINDINGS OF GUILTY ON TWO SEPARATE CONSPIRACY CHARGES?"

contacted a buyer for the ammunition, Specialist W.C.W. gave the ammunition to the buyer, and the said Private (E-2) Brian A. Murphy removed linked 5.56 millimeter ammunition, brought it to Specialist W.C.W., and Specialist W.C.W. took possession of the ammunition so that Specialist W.C.W. could arrange to sell the ammunition to a buyer.

The findings of guilty of Charge I and its specification (consolidated) are AFFIRMED. The finding of guilty of Specification 2 of Charge I is set aside and that specification is DISMISSED. The remaining findings of guilty and the approved sentence are AFFIRMED. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Chief Judge PEDE, Senior Judge LIND, Senior Judge KERN, Senior Judge COOK, Judge TELLITOCCI, Judge ALDYKIEWICZ, Judge MORAN, and Judge BORGERDING concur.

Judge CAMPANELLA took no part in the decision of this case.

KRAUSS, Judge, dissenting in part:

"[I]t is not reasonable to construe § 844(j) as including within its ambit a single 9-millimeter cartridge, simply because it contains a small amount of gunpowder and can be fired from a gun." *United States v. Graham*, 691 F.3d 153, 164 (2d Cir. 2012) *vacated on other grounds*, __ U.S. __, 133 S.Ct. 2851 (2013).

"[T]he serious and substantial nature of the other explosives listed suggests that the tiny amount of gunpowder used to fire a gun does not constitute 'an explosive' within the meaning of § 844(h)(1)" and thus the meaning of explosive in § 844(j). *United States v. Thompson*, 728 F.3d 1011, 1017 (9th Cir. 2013) (adopting the reasoning in *Graham*, 691 F.3d at 160-61).

"[The Second Circuit] concluded that ammunition is not an explosive for purposes of 18 U.S.C. § 844(j) simply because it may be fired from a gun." *Thompson*, 728 F.3d at 1026 n.9 (Murguia, J., dissenting).

"Congress intended that, to the extent 'practicable,' trial by court-martial should resemble a criminal trial in a federal district court. . . [U]nless there is reason not to do so, an interpretation of a provision of the Uniform Code should follow a well-established interpretation of a federal criminal statute concerning the same subject." *United States v. Valigura*, 54 M.J. 187, 191 (C.A.A.F. 2000).

The first goal of the 1984 *Manual for Courts-Martial*, in which the President adopted the federal definition of explosive, "was to conform to federal practice to the extent possible . . . ." Rule for Courts-Martial [hereinafter R.C.M.] at A21-1.

The fact is that small arms ammunition is not regulated or prosecuted as an explosive in federal district court and there is nothing impracticable about enforcing the law as it is there, here in a court-martial. The federal district courts use the exact same definitions of explosive and firearm at play in courts-martial and reject the "syllogism" employed by the majority here. And while I share the sentiment that ammunition is dangerous and deserved of strict regulation, it is not treated as a dangerous explosive under the federal definition adopted by the President for use in courts-martial.[12]

Contrary to the majority's characterization of the facts of this case, the parties did not merely "complement" the definition of explosive under R.C.M. 103 with reference to a regulation, they substituted and relied upon a regulatory definition to categorize small arms ammunition as an explosive in a fashion outside the scope of R.C.M. 103.

The majority here effects the same modification. It takes the definition of explosives meant for bombs and adds small arms ammunition. This is a job for the President not us. The President adopted the definitions of firearms and explosives under Chapters 12, Civil Disorders and 40, Importation, Manufacture, Distribution and Storage of Explosive Materials of Title 18 U.S.C., involving §§ 232 and 844, respectively. He recapitulated the definition of firearms under § 232(4) in R.C.M. 103(12). He combined the definitions of explosives under §§ 232(5) and 844(j) into one in R.C.M. 103(11). We are bound to interpret and apply that rule as it is, and leave additions to Congress or the Commander in Chief. The fact that the military judge, trial counsel and appellant all ultimately relied on a definition provided by an Army regulation, rather than R.C.M. 103(11), reveals the fact that they were either unsure whether small arms ammunition was included in the Rule for Courts-Martial definition, or concluded that it was not, and their substitution of an inapplicable definition is itself sufficient basis to reject this plea on appeal.

Not a single federal case holds that small arms ammunition in and of itself is an explosive. The lack of cases is telling. It may have much to do with the fact that

---

[12] Indeed, 5.56 mm ammunition can be purchased at WalMart in quantity and at relatively cheap prices. *Looking for Answers about Federal Ammunition Federal Cartridge 5.56mmx45mm 62gr FMJ Ball-Clipped Ammo Can, 420 Rounds?* (30 May 2014), http://answers.walmart.com/answers/1336/product/21638833/questions.htm. Grenades are, as yet, unavailable at that retail chain.

Congress promulgated a separate chapter, Chapter 44, Firearms, under Title 18 U.S.C. dealing specifically with firearms and ammunition. That chapter itself treats ammunition and explosives as if they are separate and distinct items. *See, e.g.*, 18 U.S.C. §§ 921(a)(4) and (17), § 922 and § 924.[13]

Contrary to the majority's read of *United States v. Graham*, the Second Circuit directly rejected the reasoning and arguments the majority here advances when it resolved that small arms ammunition, in and of itself, does not constitute an explosive as contemplated under 18 U.S.C. § 844(j).

To begin with, the majority mistakes the proposition that small arms ammunition configured in certain amounts and in a certain way might be used as an explosive for the proposition that a round of small arms ammunition is, as defined by R.C.M. 103(11), an explosive in and of itself.[14]

Though the majority's ultimate holding seems to limit itself to the particular facts of this case, its conclusion cannot be reached without first concluding that a round of ammunition constitutes an explosive under R.C.M. 103(11) because it contains a bit of propellant powder.

As the Second Circuit concluded, "it is not reasonable to construe § 844(j) as including within its ambit a single 9-millimeter cartridge, simply because it contains a small amount of gunpowder and can be fired from a gun." *Graham*, 691 F.3d at 164. Thus it explicitly rejects the reasoning that because the definition of firearm means any weapon designed to expel any projectile by the action of an explosive then small arms ammunition must be an explosive. *Id*.; *see also Thompson*, 728 F.3d at 1026. The definitions of explosive and firearm are the same under R.C.M. 103 as they are in the federal civilian system and in the cases relied upon by the majority. For example, the Second Circuit in *Graham* was dealing with the interplay between Title 18 U.S.C. §§ 844 and 924 which contain the same definitions of explosive and firearm at issue in this case.

---

[13] Because the offenses in this case occurred in North Carolina, it is interesting to note that the North Carolina Court of Appeals held that small arms ammunition is not an explosive device when dealing with a similar issue. *State v. Sherrod*, 191 N.C. Ct. App. 776, 777-82, 663 S.E.2d 470, 472-75 (2008).

[14] "We do not hold that ammunition generally (small arms or otherwise), *which may conceivably be employed in quantities or in a manner far different from the single 9-millimeter cartridge discharged by Graham, cannot fall within § 844(j)'s definition of explosive, and thus trigger the § 844(h) enhancement.*" *Graham*, 691 F.3d at 164 (emphasis added).

The reason why R.C.M. 103 contains the same definitions as those under Title 18 U.S.C. is because, as the drafters of the 1984 *Manual for Courts-Martial* put it, the first goal of the 1984 Manual "was to conform to federal practice to the extent possible, except where the Uniform Code of Military Justice requires otherwise or where specific military requirements render such conformity impracticable" citing Article 36, UCMJ, which obligates the President to "apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts" as far as is practicable when prescribing rules. The drafter's analysis of R.C.M. 103 makes plain that "whenever possible, [they] followed the definitions used in the United States Code." Indeed, the only analysis of R.C.M. 103(11) and (12) provides reference to the statutes they copied and that the President adopted as definitions of explosives and firearms. The rule itself makes explicit reference to those statutes, review of which reveals that the R.C.M. simply combines elements of 18 U.S.C. § 232(4) and (5) and § 844(j) and ultimately completes the copy by referencing the rest of what those statutes cover.

As the Second Circuit again makes plain, the definition adopted by the President comes from anti-bombing statutes. *Graham*, 691 F.3d at 162. Small arms ammunition was not intended to be covered. *See United States v. Gelb*, 700 F.2d 875, 878-79 (2d Cir. 1983). *Gelb* indicates that contemporaneous with the adoption of the statutory definitions at issue, the definition of explosive was understood to mean bombs and other high explosives. 799 F.2d at 878. This is what the court in *Graham* means when it relies on the companion words of the explosives definition: not firearm, but dynamite and other high explosives, etc. *Graham*, 691 F.3d at 161.

This reliance on companion words verifying the purpose and parameters of the definition was most recently endorsed by the 9th Circuit in *Thompson*, recognizing that "the serious and substantial nature of the other explosives listed suggests that the tiny amount of gunpowder used to fire a gun does not constitute 'an explosive' within the meaning of § 844(h)(1)" and thus the meaning of explosive at issue here. 728 F.3d at 1017; *see also id*. at 1026 n.9 (Murguia, J., dissenting) (where the dissenting judge even recognizes that the Second Circuit "concluded that ammunition is not an explosive for purposes of 18 U.S.C. § 844(j) simply because it may be fired from a gun"); *United States v. Hepp*, 656 F.2d 350, 351-52 (8th Cir. 1981) (noting that the first category of explosives under § 844(j) is the same as that contemplated under § 841 of the same title, in other words, high explosives). Thus, the Second Circuit also directly rejects the majority's reasoning by reference to § 844(g) and § 845 when it decided that "to the extent that the exemptions in § 844(g) and § 845 support the Government's reading of § 844(j), we think that this support is outweighed by the contrary arguments from text and structure set out above." *Graham*, 691 F.3d at 164.

The Fourth Circuit gives a somewhat contrary reading to § 844(j) and offers similar reasoning to that of the majority here in that "the discharge of a handgun

involves and requires an 'explosive'" and that "'shooting' requires an explosion to expel a projectile from a firearm" in concluding that "the explosion of gunpowder inside a handgun when it is discharged constitutes a 'use' of an explosive" for the sentencing guideline at issue in that case. *Davis*, 202 F.3d at 219. But here again, the Fourth Circuit quite carefully and purposefully declines to hold or reason that small arms ammunition is an explosive in and of itself when it restricts its rationale to "[t]he ammunition *in a loaded handgun*." *Id*. (emphasis added). In other words, though the Second Circuit rejects reliance on *Davis*, their reasoning is similar in acknowledging that small arms ammunition might be the proper subject of some use of explosive prosecution depending on its amount and configuration. *Graham*, 691 F.3d at 163-64. The same is true under the UCMJ. Small arms ammunition configured as a bomb is a proper basis for prosecution for the crime of threat or hoax designed or intended to cause panic or public fear under Article 134 but is not the proper basis for the offense of selling or stealing explosives under Articles 108 and 121. *MCM*, pt. IV, ¶ 109.

A distinction between explosives and small arms ammunition for purposes of prosecution is not unusual in the history of military justice. *See, e.g., Hall*, 3 M.J. at 970 (holding that blank rounds of M-16 ammunition were not highly explosive articles, though they contained gunpowder, and relying on a previous decision of that court holding that an order prohibiting the possession of explosives did not prohibit the possession of ammunition).

It is also worthwhile to note that, prior to 1984, Congress, successive Presidents and the military community were apparently happy demarking the maximum punishments for wrongful sale and theft of military property by value alone without any reference or concern for the explosive nature of that military property. *See, e.g.*, *Manual for Courts-Martial*, *United States* (1969 Rev. ed.). It bears repeating that the adoption of the federal explosives definition came from a desire to conform to federal practice not from any articulated and particular military interest beyond that which was included in the definitions of firearms and explosives at the time.[15] There is nothing impracticable about enforcing the value maximum punishments rather than that of explosives, in relation to small arms ammunition, absent an amendment to the rule. *See* UCMJ art. 36.

---

[15] Reference to the military and government interest in applying a maximum punishment to explosives regardless of value because of their intrinsic danger begs the question. The issue is not whether ammunition is dangerous, the issue is whether ammunition is either a firearm or an explosive as defined by R.C.M. 103(11) and (12).

At the very worst for appellant, the definition of explosives is sufficiently ambiguous to warrant a narrow rather than expansive reading of the rule.  Prior to its decision in *Thompson*, the Ninth Circuit declared the statutory definition of the term explosive as ambiguous and that it "does not have a clear meaning." *Gunderson v. Hood*, 268 F.3d 1149, 1154-55 (9th Cir. 2001).  In circumstances such as these, it is not our function to aggrandize criminal liability but rather to limit it and permit Congress and the President to perform their respective functions.  *See United States v. Schelin*, 15 M.J. 218, 220 (C.M.A. 1983) (citing *United States v. Emmons*, 410 U.S. 396, 411 (1973)); *United States v. Rice*, 71 M.J. 719, 725 (Army Ct. Crim. App. 2012); *United States v. McPherson*, 68 M.J. 526, 529 (Army Ct. Crim. App. 2009); *see generally United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F. 2008) (ordinary rules of statutory construction apply to Rules for Courts–Martial).[16]

The facts of this case are also telling:  (1) the stipulation of fact says nothing about explosives but details the value of the ammunition; (2) the military judge, *prior to plea*, required the government to provide "some sort of documentation listing 5.56 ammunition as an explosive"; (3) the trial counsel, defense counsel, appellant and judge initially relied, in part, on a definition of explosives from Army Regulation (AR) 75-14 that specifically includes "small arms ammunition" in its definition of explosive ordnance, in addition to the definition applicable to Articles 108 and 121, UCMJ; and, most importantly, (4) ultimately the judge and appellant relied exclusively on the AR 75-14 definition to establish appellant's guilt.  *See* Army Reg. 75-14, Interservice Responsibilities for Explosive Ordnance Disposal, para. 3.e (14 February 1992).[17]

The ambiguity of the explosives definition perceived at appellant's court-martial is manifest in the behavior of the military judge, trial and defense counsel and in accord with the ambiguity recognized in *Gunderson*.  It appears that unable to resolve whether the ammunition alleged was included under R.C.M. 103(11), they looked elsewhere:  before entry of pleas, the judge when describing the content of an R.C.M. 802 conference stated "I also informed counsel that the court required some sort of documentation as to the -- some sort of documentation listing 5.56 millimeter

---

[16] This is not a trivial matter.  Though in this case appellant's liability could have been easily fixed by allegation of the value of the ammunition, in general terms we are dealing with the difference between a maximum including ten years confinement and a maximum including only one year in confinement.

[17] Before resorting to AR 75-14 the military judge did twice define explosives as it is under R.C.M. 103(11), but never was there any discussion about gunpowder, smokeless powder, propellant powder or powder of any sort, in an individual round of ammunition or in the aggregate, serving as the basis for appellant's plea.

ammunition as an explosive." Then during the *Care* inquiry, the following exchange between the judge and appellant occurred:

> MJ: I have appellate exhibit 4, Private Murphy, which is an excerpt from Army Regulation 75-14 *that provides the definition of explosives*. Do you agree that paragraph 3(e) encompasses small arms ammunition as explosives?
>
> ACC: Yes, sir.
>
> MJ: And is 5.56 millimeter ammunition an explosive in accordance with this Army Regulation?
>
> ACC: Yes, that is correct.

(emphasis added).

This is plainly an error. There exist various regulatory definitions of explosive. The definition under AR 75-14 is provided for the purpose of that regulation, not prosecution under the UCMJ. For example, in addition to the Army Regulation 75 series, there is AR 385-63, which seems to treat ammunition and explosives as distinct items. Army Reg. 385-63, Range Safety, (16 Apr. 2014). *See also, e.g.,* 27 C.F.R. § 555.11 and § 555.141 (2014). The definition of explosive for the purposes of Articles 108 and 121, is that contained in R.C.M. 103. If the President wants to incorporate definitions from Army Regulations he may do so. He hasn't, he adopted the statutory definitions discussed above.[18]

At a minimum, the record reveals, therefore, that appellant understood his liability as defined by a definition that does not apply to the offenses charged.[19] As

---

[18] Which is it – is small arms ammunition obviously included in R.C.M. 103(11) despite the fact that it is not mentioned or is explicit reference to small arms ammunition under AR 75-14 superfluous? The majority opinion seems to simultaneously hold to the contrary views that small arms ammunition, though not mentioned, is obviously included in R.C.M. 103(11) but that explicit inclusion of small arms ammunition in the definition of explosives ordnance under AR 75-14 is not superfluous.

[19] It cannot serve as notice to appellant that small arms ammunition is an explosive under R.C.M. 103(11) as that definition is limited to its terms and the referenced statutes upon which it is based.

such the plea is improvident. *See United States v. Medina*, 72 M.J. 148 (C.A.A.F. 2013).

For this and the reasons above, I therefore respectfully dissent from that part of the majority's decision.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court